UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

EMANUEL TOLON,

        Defendant.

Case No. 19-cr-20022

Hon. Matthew F. Leitman
United States District Judge

## United States' Response Opposing the Defendant's Motion for Compassionate Release or Recommendation for Home Confinement

In the Spring of 2018, ATF agents used a confidential informant to make a series of controlled purchases of cocaine base from Emanuel Tolon. ATF agents obtained and executed a search warrant at Tolon's home where they found over 14 grams of crack cocaine, three digital scales, a loaded assault rifle, a loaded AK-style pistol, and three loaded AK magazines. The government charged Tolon with one count of possession with intent to distribute cocaine base and Tolon pleaded guilty.

Tolon's sentencing guidelines were 46-57 months, and the court sentenced him to 28 months of custody. After the sentencing hearing on July 11, 2019, Tolon was remanded to custody of the U.S. Marshals and he was housed in the Clare County Jail, where he has been since. According to the Marshals, the Bureau of Prisons

1

recently designated Tolon to FCI Allenwood Medium Security, and he will be transferred to BOP custody soon. FCI Allenwood Medium has had one staff member test positive and recover from Covid-19, and has had no other confirmed cases. *See* [BOP Covid-19 Website](). Tolon's anticipated release date is July 6, 2021. Tolon now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Tolon does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, Tolon does not have a condition that places him at higher risk from Covid-19. Tolon's criminal history (which includes assaults and drug-related misdemeanors) and his offense make him a danger to the community, which precludes release under USSG § 1B1.13(2). Tolon's crime was dangerous, not only because he was selling crack for a sustained period of time, but because he was doing so while armed with two stolen assault weapons, both of which were loaded and out in the open at his home when ATF executed a search warrant. There were also three additional high capacity magazines in the home that were loaded for extra firepower.

The § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release. If the Court released Tolon now, his sentence would not be sufficient to deter further criminal conduct, or reflect the seriousness of his crime, or protect the safety of the community.

Since his sentencing hearing, Tolon has been serving his sentence in the Clare County Jail, which has taken numerous measures to protect the safety of inmates and jail staff. Because of his recent designation, he will soon be transferred to a Bureau of Prisons facility—FCI Allenwood Medium Security.

The Bureau of Prisons has taken significant steps to protect all inmates from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of June 22, 2020, this process has already resulted in at least 4,418 inmates being placed on home confinement. *See* [BOP Covid-19 Website](). Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal

3

activities," *Wilson*, 2020 WL 3056217, at *11—the Court should deny Tolon's motion for compassionate release.

## Background

Tolon began serving his 28 month prison sentence on July 11, 2019. His projected release date is July 6, 2022, so he has served slightly less than half of his anticipated sentence. He is 24 years old, and his only underlying medical conditions are anemia and seasonal allergies. More than seven years ago, he was struck by a car and seriously injured, sustaining a bruised lung. The most recent documentation of Tolon's lung injury is from 2013, and he has produced no medical records to show that the injury persists. Fortunately, it appears that over the last seven years Tolon has fully recovered from his lung injury. Nevertheless, Tolon has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic.

Because Tolon was not in BOP custody, he was unable to seek administrative remedies from BOP and therefore the government, in this case, does not contest Tolon's request on the grounds that he failed to exhaust administrative remedies. As noted above, Tolon was recently designated to the BOP where he soon be transported to begin serving the remainder of his sentence.

**Argument**

I.  **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   A.  **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Clare County Jail, has taken numerous precautions to ensure the safety of staff and inmates including Tolon during the Covid-19 pandemic. Tolon will soon be transferred to the Bureau of Prisons. The BOP also has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a [detailed protocol](#) for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 2020 WL 3056217, at *2.

On March 13, 2020, the BOP began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* [BOP Covid-19 Modified Operations Website](#). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 2020 WL 3056217, at *2. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with

medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued facemasks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 2020 WL 3056217, at *2. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4,400 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United*

7

*States v. Alam*, ___ F.3d ___, No. 20-1298, 2020 WL 2845694, at *5 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 2020 WL 3056217, at *11.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release

8

or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 2020 WL 3056217, at *11, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care

9

and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.  The Court should deny Tolon's motion for compassionate release.

Tolon's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has

10

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. Because Tolon had no administrative remedies to pursue with BOP, the government does not contest Tolon's motion based on his failure to seek such remedies.

*Second*, even in cases where a defendant has exhausted remedies, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the

seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Tolon is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

12

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in [Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to inmates. *See Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2, *8 (6th Cir. June 9, 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering

13

BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 2020 WL 3056217, at *11.

Tolon's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Tolon is a healthy 24 year old. His seasonal allergies and anemia are not "terminal illnesses." *See* USSG § 1B1.13 cmt. n.1(A)(i). Nor do they substantially diminish Tolon's ability "to provide self-care within the environment of a correctional facility." *See* USSG § 1B1.13 cmt. n.1(A)(ii).

Tolon's age and medical records also confirm that he does not have a CDC-recognized risk factor for Covid-19. So whether considered alone or in combination with the Covid-19 pandemic, Tolon's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

Tolon also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D.

14

Mich. June 9, 2020). It also bars the release of many other defendants. An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2).

Tolon's criminal history (which includes several convictions for assaultive offenses), and the circumstances of his offense (making multiple crack cocaine sales and possessing two loaded stolen assault weapons with three additional high capacity magazines that were all loaded) support the fact that he would be a danger if released.

Adhering to § 1B1.13(2) is especially important given the current strain on the community caused by increased crime during the Covid-19 pandemic. In recent years, Flint has seen more than its share of violent crime. Tolon was shot in the Spring of 2018 and one of his close acquaintances was murdered. But during the Covid-19 pandemic, Flint has seen a spike in shootings and murders. Tolon's own brother was shot on May 31, 2020, and shootings and firearm-related murders are up significantly over last year at this time. There are real risks to public safety right

15

now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

### B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Tolon eligible for compassionate release, the § 3553(a) factors still disqualify him.

Tolon's 28 month sentence was a significant downward variance from the guideline range of 46-57 months. Compassionate release at this point would result

in Tolon serving less than half of his anticipated sentence. It would result in an unwarranted disparity; it would be insufficient to deter Tolon from committing future crimes; it would not reflect the seriousness of Tolon's crime; and it is not sufficient to protect the community.

### III. The Court should decline Tolon's request for a recommendation that he be granted home confinement.

The Court should also deny Tolon's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Tolon is not a strong candidate for it. Tolon is young and has a lot of potential. His best chance at succeeding as a productive member of society would be for him to serve his sentence, go on supervise release and obtain employment or attend a culinary school as he discussed in his presentence interview. If the court released Tolon to home confinement in the middle of a pandemic, it would be difficult to supervise Tolon or provide him access to educational and vocational resources. Release to home confinement would unwisely set him up for failure.

### IV. If the Court were to grant Tolon's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Tolon's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

17

## Conclusion

Tolon's motion should be denied.

Dated: June 23, 2020            MATTHEW SCHNEIDER
                                United States Attorney

                                */s Jules M. DePorre*_____
                                JULES M. DePORRE (P73999)
                                Assistant United States Attorney
                                600 Church Street
                                Flint, Michigan 48502-1280
                                Phone: (810) 766-5026
                                Fax: (810) 766-5427
                                jules.deporre@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on June 23, 2020, I filed the foregoing document using the court's CM/ECF system which will provide notice to Christopher McGrath, attorney for Emanuel Tolon.

                                */s Jules M. DePorre*
                                Assistant U.S. Attorney

18